COMPETITIVE ENTERPRISE INSTITUTE, and Consumer Alert, Petitioners,

v.

NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, Respondent.

No. 93–1210.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1994.

Decided Feb. 3, 1995.

---

Sam Kazman, Washington, DC, argued the cause and filed the briefs, for petitioners.

Peter R. Maier, U.S. Dept. of Justice, Washington, DC, argued the cause, for respondent. With him on the brief were Eric H. Holder, Jr., U.S. Atty., Barbara C. Biddle, U.S. Dept. of Justice, and Kenneth N. Weinstein, Asst. Chief Counsel, and Enid Rubenstein, National Highway Traffic Safety Admin., Washington, DC.

Before EDWARDS, Chief Judge, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Competitive Enterprise Institute and Consumer Alert (hereinafter referred to jointly as the CEI) petition for review of the National Highway Traffic Safety Administration rulemaking setting the corporate average fuel economy (CAFE) standard for 1990 passenger cars. The petitioners claim that the agency arbitrarily and capriciously failed to acknowledge significant adverse safety effects of setting the standard at 27.5 rather than 26.5 miles per gallon or somewhere in between. Finding that the agency adequately rooted its decision in the record of the rulemaking, we deny the petition for review.

## I. BACKGROUND

In response to the then-restricted world supply of oil, the Congress enacted the Energy Policy and Conservation Act of 1975, which was intended, among other things, to induce automobile manufacturers to improve the fuel economy of their cars. The Act set a CAFE standard for passenger cars that increased several times and then leveled off at 27.5 miles per gallon for model years 1985 and beyond. 15 U.S.C. § 2002(a)(1). The NHTSA is authorized to raise or lower the standard for a particular model year, however, in order to achieve the "maximum feasible average fuel economy," taking into account technological feasibility, economic feasibility, the effect upon fuel economy of other federal motor vehicle standards, and the need of the nation to conserve energy. See 15 U.S.C. § 2002(e) (listing factors); 15 U.S.C. § 2002(a)(4) (granting Secretary of Transportation discretion to amend CAFE standard); 49 C.F.R. § 1.50(f) (delegating authority to NHTSA). Although the Act does not list safety as a factor that the agency is

to consider in setting the CAFE standard, the NHTSA has previously considered safety as an aspect of technological or economic feasibility. *See Competitive Enterprise Institute v. National Highway Traffic Safety Admin.,* 956 F.2d 321, 322 (D.C.Cir.1992) (*"CEI II"*).

Under the Act, a manufacturer that fails to meet the CAFE standard is liable for a monetary penalty. 15 U.S.C. § 2008(b)(1). A manufacturer may, however, offset its shortfall in meeting the CAFE standard one year with credits it earns by exceeding the standard in other years. 15 U.S.C. § 2002(*l*). A manufacturer may carry credits backward or forward up to three model years.

Each manufacturer must meet the CAFE standard separately for its domestically manufactured fleet and for its "not domestically manufactured" fleet, which is defined to exclude cars built in the United States from imported parts. In 1988 the NHTSA was concerned that the 27.5 mpg standard might lead American automobile manufacturers to shift some of their large-car manufacturing activity overseas in order to average the fuel economy of those cars with more of their small cars, thereby raising the average fuel economy of their domestic fleets and lowering the comfortably high average fuel economy of their non-domestic fleets. *Notice of Proposed Rulemaking: Passenger Automobile Average Fuel Economy Standards for Model Years 1989 and 1990,* 53 Fed.Reg. 33,080, 33,080–81 (1988). Foreseeing the job loss and "potential economic harm" that might occur, the NHTSA proposed to lower the MY 1989 and 1990 CAFE standards from 27.5 mpg to not less than 26.5 mpg. *Id.* at 33,083.

Later in 1988 the NHTSA lowered the CAFE standard for MY 1989 from 27.5 mpg to 26.5 mpg. *Final Rule: Passenger Automobile Average Fuel Economy Standards for Model Year 1989,* 53 Fed.Reg. 39,275 (1988). We affirmed. *See Competitive Enterprise Institute v. National Highway Traffic Safety Admin.,* 901 F.2d 107, 110 (D.C.Cir.1990) (*"CEI I"*). In 1989, however, the agency terminated the MY 1990 aspect of the rulemaking without changing the CAFE standard for that year. "This decision [was] based largely on the increasing need of the nation to conserve energy and a conclusion by the agency that retention of the 27.5 mpg standard for MY 1990 [would] not have a significant adverse effect on U.S. employment or on the competitiveness of the U.S. auto industry." *Termination of Rulemaking: Passenger Automobile Average Fuel Economy Standard for Model Year 1990,* 54 Fed.Reg. 21,985, 21,989 (1989). The NHTSA also concluded, contrary to the submission of the CEI, that leaving the MY 1990 CAFE standard at 27.5 mpg would not have an adverse effect upon automotive safety. *Id.* at 21,992–94.

Upon the CEI's petition for review, we remanded the MY 1990 decision to the agency to address whether the 27.5 mpg standard for that year would cause automobile manufacturers either to limit the availability of larger cars in their fleets, or (what is in substance the same thing) to raise the price of their larger cars in order to discourage some consumers from purchasing them; in either event, some consumers would be priced out of the market for larger, safer cars. *CEI II,* 956 F.2d at 323. Accordingly, the NHTSA reopened the rulemaking in October 1992 and requested comments on: whether it should lower the MY 1990 CAFE standard; any actions that the automobile manufacturers would take if it did so; the potential safety effect of lowering the standard; and the appropriate role of safety concerns generally in setting CAFE standards. *Reopening of Rulemaking Proceeding; Request for Comments, Passenger Automobile Average Fuel Economy Standard for Model Year 1990,* 57 Fed.Reg. 48,777, 48,778–79 (1992). No manufacturer suggested that lowering the MY 1990 CAFE standard would affect its production or sale of cars, and no other commenter provided evidence that a standard of 27.5 mpg would cause any manufacturer to increase the price of larger, safer cars. Therefore, finding no significant safety effect of leaving the statutory CAFE standard in place for MY 1990, the agency terminated the rulemaking without taking further action. *Termination of Rulemaking: Passenger Automobile Average Fuel Economy*

*Standard Model Year 1990,* 58 Fed.Reg. 6939, 6943 (1993). The CEI now petitions for review of that decision.

## II. ANALYSIS

■ Our review of the NHTSA's decision is limited to determining whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See CEI I,* 901 F.2d at 120. We must uphold the decision if the agency provided a "reasoned explanation for terminating its inquiry into whether ... to relax the 27.5[mpg] standard." *CEI II,* 956 F.2d at 323. While we are mindful that the NHTSA has adhered to the position it first took in the decision that we remanded, *cf. Greyhound Corp. v. ICC,* 668 F.2d 1354, 1358 (D.C.Cir.1981) (according greater scrutiny to order that on remand from court reaches same result as in original order), our review is still a matter of determining whether the agency's final decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

■ The CEI contends that the NHTSA, on remand, failed to give adequate consideration to the petitioners' contention that retaining the statutory CAFE standard for MY 1990 would have significant adverse safety effects. Specifically, the CEI claims that the agency failed to consider that (1) the CAFE standard causes automobile manufacturers to downsize passenger cars, resulting in significantly more traffic fatalities because larger, heavier cars are safer than smaller, lighter cars; and (2) the CAFE standard constrains automobile manufacturers from upsizing cars, thereby pricing consumers out of the market for larger, heavier, and (presumably) safer cars. The substance of the CEI's position is intuitively appealing. We must deal here, however, not with our intuition and not with the petitioners' position in the abstract, but with the concrete record before us and with the conclusions that the agency drew from it. That record adequately supports the NHTSA's conclusion that maintaining the 27.5 mpg CAFE standard for MY 1990 would not significantly affect the safety of the motoring public.

First, the NHTSA reasonably concluded from the evidence before it that the MY 1990 CAFE standard did not cause automobile manufacturers either to downsize or to refrain from upsizing their cars. In its notice reopening the rulemaking proceeding, the agency asked commenters to address:

> What specific actions [manufacturers would] actually take, if any, depending upon whether the MY 1990 CAFE standard remained at 27.5 mpg or were reduced to some level between 26.5 mpg and 27.5 mpg? If the standard remained at 27.5 mpg, would manufacturers downsize vehicles, refrain from upsizing vehicles[,] or change the mix or pricing policies of the vehicles they offer for sale?

*Reopening of Rulemaking Proceeding: Passenger Automobile Average Fuel Economy Standard for Model Year 1990,* 57 Fed.Reg. 48,777, 48,778 (1992). Further, recognizing that a regulatory change made in 1992 would not affect the production of vehicles in MYs 1990–92, the NHTSA asked the automobile manufacturers to state what specific actions they would take with respect to any model year (presumably by carrying credits backward or forward) were the agency to lower the 1990 standard. *Id.*

No manufacturer identified any change that it would make in the size or weight of its vehicles, in its product mix, or in its pricing strategy—for any model year—if the NHTSA were to lower the MY 1990 CAFE standard. In fact, the Ford Motor Company asserted that it "did not reduce its average car size over what would have been offered absent such 1990 standard." The General Motors Corporation stated that "relaxing the standard could in some cases generate credits giving manufacturers more flexibility to offer larger, safer cars in later model years," but did not go so far as to suggest that it would be one of the beneficiaries. Accordingly, the NHTSA reasonably decided that maintaining the MY 1990 CAFE standard would have no appreciable effect upon the size or weight of automobiles offered for sale in any model year.

Second, the factual record simply does not support the CEI's contention that consumers are priced out of the market for larger, heavier cars by reason of the 27.5 mpg standard. As part of the rulemaking for the MY 1986 CAFE standard, the NHTSA analyzed the cost-effectiveness of various technological changes that manufacturers have used to meet fuel economy standards. That analysis showed that most of the technological changes paid for themselves with fuel savings over the first four years of ownership and that all but one were cost-effective over the life of the vehicle. *See Final Regulatory Impact Analysis for MY 1986 Passenger Car CAFE Standard* III–32, III–33 (1985). Moreover, the NHTSA noted that the technological changes—including improved aerodynamics, substitution of lighter materials, fuel injection, electronic engine control, wide ratio gearing, reduced lubricant viscosity, and reduced rolling resistance—are widely available on large and small cars alike. Therefore, any increase in the purchase price of cars owing to those features would not impose a relative penalty upon the purchase of a large car. Finally, while the NHTSA recognized that a manufacturer could attempt to induce a shift in its product mix either by reducing the price of its small cars or by increasing the price of its large cars (or both), *see* 58 Fed.Reg. at 6944, the agency noted that no manufacturer commented in the rulemaking on remand that it had taken either step in order to meet the MY 1990 CAFE standard of 27.5 mpg.

Finally, the NHTSA considered the study upon which the CEI rested its contention that the MY 1990 CAFE standard had a significant effect on safety. *See* Robert W. Crandall & John D. Graham, *The Effect of Fuel Economy Standards on Automobile Safety*, 32 JOURNAL OF LAW & ECONOMICS 97, 109–10 (1989). That study suggests that in the 1980s manufacturers significantly reduced the average weight of their cars due to the CAFE standards. Using a model describing the relationship of automobile weight to safety, and explaining weight as a function solely of CAFE regulation and of the expected prices of gasoline and steel (as forecast four years in advance), Crandall and Graham estimated that the CAFE program

caused a "500–pound or 14 percent reduction in the average weight of 1989 cars," which was "associated with a 14–27 percent increase in occupant fatality risk." *Id.* at 111.

The NHTSA did not directly dispute the general finding of the Crandall and Graham study, *i.e.*, that there is a relationship between safety and the size or weight of automobiles. *See* 58 Fed.Reg. at 6946 ("The agency ... fully agrees ... that all other things being equal, a large car is safer than a small car"). Instead the agency faulted Crandall and Graham for failing to take account of factors in addition to gasoline and steel prices—namely, "technological advances," "increased competition," and "changes in consumer preferences"—that in the agency's view would explain almost all of the average car's weight loss that the authors instead attributed to the CAFE standard. (Indeed the agency even suggested that "any CAFE standard effect [on weight] is negligible." *Id.*)

Although phrased in a variety of ways, the NHTSA's response to Crandall and Graham comes down to suggesting that a change in consumers' preferences, rather than any constraining effect of the CAFE standards, accounts for vehicle downsizing over the period that they studied. (After all, "increased competition" only facilitates the satisfaction of consumers' preferences; nor, if manufacturers were not constrained by the CAFE standards to adopt them, are "technological advances" relevant unless consumers demanded them). While the agency speculated that consumers might have preferred "downsized vehicles [because they] offered better handling, easier parking, and potential cost savings associated with reduced materials usage," it offered no reason whatsoever to think that consumer preferences actually did change at all during the relevant time, much less that they changed in the direction of preferring smaller and apparently more dangerous cars. Merely to assert the existence of another possible explanation, which is all that the NHTSA has done, does nothing to undermine the significance of the findings carefully documented by Crandall and Graham. It is like asserting that regulation of the airlines had no effect because it occurred

at a time when all consumers preferred amenities such as gourmet meals rather than cheaper fares; that is, of course, possible, but the only evidence is to the contrary.

The NHTSA's failure adequately to respond to the Crandall and Graham study is troubling, but it is not a basis, upon this record, for overturning the agency's decision to adhere to the 27.5 mpg CAFE standard for MY 1990. The overwhelming fact is that no automobile manufacturer is on record stating that it would have added weight to its automobiles (or taken any other action) in any model year had the NHTSA relaxed the 1990 CAFE standard. Therefore, record evidence documenting a correlation between the safety and the size or weight of a vehicle, and the contribution of the CAFE standard to determining size or weight, while potentially relevant to any future decision to retain or amend the CAFE standard, simply does not require the NHTSA to amend the MY 1990 CAFE standard.

### III. CONCLUSION

The NHTSA has identified sufficient support in the record for its decision not to amend the MY 1990 CAFE standard. The manufacturers did not assert in their comments to the agency on remand that they would implement any design or product mix changes if the NHTSA amended the MY 1990 CAFE standard and there is no hard evidence in the record that the MY 1990 CAFE standard caused any manufacturer to price any consumers out of the market for larger, safer cars. The petition for review is therefore

*Denied.*