United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 7, 2002 Decided May 24, 2002 

 No. 00-1012

 United States Telecom Association, et al., 
 Petitioners

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 Bell Atlantic Telephone Companies, et al., 
 Intervenors

 Consolidated with 
 01-1075, 01-1102, 01-1103

 ---------

 

 

 No. 00-1015

 United States Telecom Association, et al., 
 Petitioners

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 AT&T Corporation, et al., 
 Intervenors

 Consolidated with 
 00-1025

 On Petitions for Review of Orders of the 
 Federal Communications Commission

 Michael K. Kellogg argued the cause for petitioners and 
supporting intervenors in 00-1012 & 00-1015. With him on 
the briefs in 00-1012 were Mark L. Evans, Sean A. Lev, 
James D. Ellis, Paul K. Mancini, Roger K. Toppins, Gary L. 
Phillips, Lawrence E. Sarjeant, Linda L. Kent, Keith Town-
send, John W. Hunter, Julie E. Rones, William P. Barr, 
Michael E. Glover, Edward H. Shakin, John P. Frantz, 
Richard M. Sbaratta, and James G. Harralson. With him on 
the briefs in 00-1015 were Mark L. Evans, Sean A. Lev, 
David L. Schwarz, Lawrence E. Sarjeant, Linda L. Kent, 
Keith Townsend, John W. Hunter, Julie E. Rones, Sharon J. 
Devine, Robert B. McKenna, William T. Lake, John H. 

Harwood II, Jonathan J. Frankel, James D. Ellis, Paul K. 
Mancini, Roger K. Toppins, Gary L. Phillips, Michael E. 
Glover, Edward H. Shakin, William P. Barr, John P. Frantz, 
Jonathan B. Banks, Richard M. Sbaratta, and James G. 
Harralson. Donna M. Epps entered an appearance in 
00-1012. Daniel L. Poole and William R. Richardson, Jr. 
entered appearances in 00-1015.

 Laurence N. Bourne, Counsel, Federal Communications 
Commission, argued the cause for respondents in 00-1012. 
With him on the brief in 00-1012 were Charles A. James, 
Assistant Attorney General, Daniel M. Armstrong, Associate 
General Counsel, John E. Ingle, Deputy Associate General 
Counsel, James M. Carr, Counsel, Catherine G. O'Sullivan 
and Nancy C. Garrison, Attorneys, U.S. Department of Jus-
tice. Lisa S. Gelb, Counsel, Federal Communications Commis-
sion entered an appearance in 00-1012.

 Richard K. Welch, Counsel, Federal Communications 
Commission, argued the cause for respondents in 00-1015. 
With him on the briefs in 00-1015 were Charles A. James, 
Assistant Attorney General, Daniel M. Armstrong, Associate 
General Counsel, John E. Ingle, Deputy Associate General 
Counsel, Laurence N. Bourne and James M. Carr, Counsel, 
Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, 
U.S. Department of Justice. Lisa S. Gelb, Counsel, Federal 
Communications Commission, entered an appearance in 
00-1015.

 Jonathan Jacob Nadler argued the cause for intervenors 
AT&T Corp., et al. in 00-1012. With him on the brief in 
00-1012 were David W. Carpenter, Peter D. Keisler, James 
P. Young, Mark C. Rosenblum, Lawrence J. Lafaro, Richard 
H. Rubin, Donald B. Verrilli, Jr., Maureen F. Del Duca, 
Michael B. DeSanctis, Thomas F. O'Neil III, William Single, 
IV, Theresa K. Gaugler, Charles C. Hunter, Catherine M. 
Hannan, Albert H. Kramer, Robert McDowell, Jay C. Keith-
ley and H. Richard Juhnke. John J. Heitmann, Jonathan 
E. Canis and Roy E. Hoffinger entered appearances in 
00-1012.

 David W. Carpenter argued the cause for intervenors 
AT&T, Corp., et al. in 00-1015. With him on the brief in 
00-1015 were Peter D. Keisler, James P. Young, C. Frederick 
Beckner III, Mark C. Rosenblum, Lawrence J. Lafaro, Rich-
ard H. Rubin, Donald B. Verrilli, Jr., Maureen F. Del Duca, 
Michael B. DeSanctis, Thomas F. O'Neil III, William Single, 
IV, Rodney Joyce, Christy C. Kunin, Russell I. Zuckerman, 
Francis D.R. Coleman, Richard E. Heatter, Marilyn H. Ash, 
Douglas G. Bonner, Albert H. Kramer, Charles C. Hunter 
and Catherine M. Hannan. Roy E. Hoffinger, Lawrence G. 
Acker, John J. Heitmann and Jonathan E. Canis entered 
appearances.

 Before: Edwards and Randolph, Circuit Judges, and 
Williams, Senior Circuit Judge.

 Opinion for the Court filed by Senior Circuit Judge 
Williams.

 Williams, Senior Circuit Judge: Petitioners in these two 
cases--certain incumbent local exchange carriers ("ILECs") 
and the U.S. Telecom Association, representing approximate-
ly 1200 such carriers--seek review of two rulemaking orders 
of the Federal Communications Commission. One order 
requires ILECs to lease a variety of "unbundled network 
elements" ("UNEs") to competitive local exchange carriers 
("CLECs"), and the other unbundles a portion of the spec-
trum of local copper loops so that CLECs can offer competi-
tive Digital Subscriber Line ("DSL") internet access. We 
grant both petitions, and remand both rules to the Commis-
sion.

I. Background

 Congress passed the Telecommunications Act of 1996, Pub. 
L. 104-104, 110 Stat. 56, codified at 47 U.S.C. s 151 et seq. 
(the "1996 Act" or the "Act"), to "promote competition and 
reduce regulation in order to secure lower prices and higher 
quality services for American telecommunications consumers 
and encourage the rapid deployment of new telecommunica-
tions technologies." 1996 Act, preamble. In pursuit of that 
goal, s 251 of the Act requires that ILECs "unbundle" their 

network elements--that is, provide them on an individual 
basis to competitive providers on terms prescribed by the 
Commission. 47 U.S.C. s 251(c)(3). To guide the Commis-
sion in deciding which network elements are to be unbundled, 
the Act goes on to specify:

 (2) Access standards
 
 In determining what network elements should be made 
 available for purposes of subsection (c)(3) of this section, 
 the Commission shall consider, at a minimum, whether--
 
 (A) access to such network elements as are proprietary 
 in nature is necessary; and
 
 (B) the failure to provide access to such network ele-
 ments would impair the ability of the telecommunica-
 tions carrier seeking access to provide the services that it 
 seeks to offer.
 
47 U.S.C. s 251(d)(2) (emphasis added).

 In its first effort at implementation, Implementation of the 
Local Competition Provisions in the Telecommunications 
Act of 1996, First Report and Order, CC Docket No. 96-98, 
11 FCC Rcd 15499 (1996) ("First Local Competition Order"), 
the Commission gave this section the following reading:

 The term "impair" means "to make or cause to become 
 worse; diminish in value." We believe, generally, that 
 an entrant's ability to offer a telecommunications service 
 is "diminished in value" if the quality of the service the 
 entrant can offer, absent access to the requested ele-
 ment, declines and/or the cost of providing the service 
 rises. We believe we must consider this standard by 
 evaluating whether a carrier could offer a service using 
 other unbundled elements within an incumbent LEC's 
 network.
 
Id. at 15643, p 285 (emphasis added). In AT&T Corp. v. Iowa 
Utilities Board, 525 U.S. 366 (1999), the Supreme Court 
found the Commission's view far too broad, saying that under 
such a standard it was "hard to imagine when the incumbent's 
failure to give access to the element would not constitute an 

'impairment.' " Id. at 389. It specifically criticized the Com-
mission's having "blind[ed] itself to the availability of ele-
ments outside the incumbent's network," including self-
provisioning and leasing from other providers. Id. It criti-
cized the Commission's view that "any increase" in the com-
petitor's cost (resulting from lack of access to an incumbent's 
element) would be an "impairment." Id. at 389-90 (emphasis 
in original). Summarizing the overall picture, it said that if 
"Congress had wanted to give blanket access to incumbents' 
networks," it "would simply have said (as the Commission in 
effect has) that whatever requested element can be provided 
must be provided." Id. at 390.

 In Iowa Utilities Board, the Supreme Court also addressed 
the Act's provisions on rates for UNEs, reversing the Eighth 
Circuit's holding that the Commission had no authority to set 
such rates. Id. at 377-86. It accordingly returned the 
remaining rate issues to the Eighth Circuit, which on remand 
invalidated the Commission's rate-setting principle, known by 
the acronym TELRIC (for "total element long-run incremen-
tal cost"). See Iowa Utilities Board v. FCC, 219 F.3d 744 
(8th Cir. 2000). The Supreme Court reversed, upholding the 
TELRIC principle. Verizon Communications, Inc. v. FCC, 
No. 00-511, 2002 WL 970643 (May 13, 2002).

 Following the Supreme Court's remand on the "impair-
ment" standard, the Commission again tackled that issue in 
the rulemakings now on review. In what we will call the 
"Local Competition Order," Implementation of the Local 
Competition Provisions of the Telecommunications Act of 
1996, Third Report and Order and Fourth Further Notice of 
Proposed Rulemaking, 15 FCC Rcd 3696 (1999), it revised its 
definition of "impair" so as to require unbundling if, "taking 
into consideration the availability of alternative elements out-
side the incumbent's network, including self-provisioning by a 
requesting carrier or acquiring an alternative from a third-
party supplier, lack of access to that element materially 
diminishes a requesting carrier's ability to provide the ser-

vices it seeks to offer." Local Competition Order, 15 FCC 
Rcd at 3725, p 51 (emphasis added); 47 C.F.R. s 51.317(b)(1). 
In weighing the availability of alternative network elements, 
the Commission noted that it would examine five factors--
cost, effect on timeliness of entry, quality, ubiquity, and 
impact on network operations. Local Competition Order, 15 
FCC Rcd at 3731, p 65, 3734-45, p p 71-100; 47 C.F.R. 
s 51.317(b)(2). Finally, it said that beyond looking simply to 
"impairment," it would consider five factors that it believed 
would further the Act's goals, namely whether unbundling 
would lead to "rapid introduction of competition in all mar-
kets," promote "facilities-based competition, investment, and 
innovation," reduce regulatory obligations, promote certainty 
in the market, and be administratively practical. 15 FCC 
Rcd at 3745-50, p p 101-16; 47 C.F.R. s 51.317(b)(3).

 Of particular importance to this case, the Commission 
decided to make its unbundling requirements (except for two 
elements) applicable uniformly to all elements in every geo-
graphic or customer market. We return in detail to this issue 
after a survey of the elements unbundled by the Local 
Competition Order:

 . Local loops, defined as "all features, functions and 
 capabilities of the transmission facilities, including 
 dark fiber and attached electronics (except those used 
 for the provision of advanced services, such as 
 DSLAMs [DSL Access Multiplexers]) owned by the 
 incumbent LEC, between an incumbent LEC's cen-
 tral office and the loop demarcation point at the 
 customer premises." 15 FCC Rcd at 3772, p 167; 47 
 C.F.R. s 51.319(a)(1). The Commission also required 
 that incumbent LECs "condition" loops so as to allow 
 CLECs to offer advanced services. 15 FCC Rcd at 
 3775, p 172; 47 C.F.R. s 51.319(a)(3). Conditioning, 
 for these purposes, means removing devices such as 
 bridge taps, low-pass filters, range extenders, etc., 
 
 that improve voice transmission but may decrease a 
 loop's advanced services capabilities. Id.
 
 . Subloops, i.e., those "portions of the loop that can be 
 accessed at terminals in the incumbent's outside 
 plant." 15 FCC Rcd at 3789, p 206; 47 C.F.R. 
 s 51.319(a)(2). Points of access might include the 
 pole near the customer's premises, the network inter-
 face device ("NID"), and the feeder distribution inter-
 face (where the trunk line from the central office 
 interfaces with the distribution line to the subscrib-
 ers). 15 FCC Rcd at 3789-90, p 206.
 
 . Network Interface Devices, which include all "fea-
 tures, functions, and capabilities of the facilities used 
 to connect the loop distribution plant to the customer 
 premises wiring, regardless of the particular design 
 of the NID mechanism." Id. at 3801, p 233; 47 
 C.F.R. s 51.319(b). This broad definition is intended 
 to make the unbundling requirement "flexible and 
 technology-neutral," so as to apply to any new NID 
 technologies that may develop. 15 FCC Rcd at 3801, 
 p 234.
 
 . Circuit switching, defined as the "basic function of 
 connecting lines and trunks," including "all the fea-
 tures, functions and capabilities of the switch." Id. at 
 3805, p 244; 47 C.F.R. s 51.319(c). The Commission 
 made one narrow exception to circuit switch unbun-
 dling, which we discuss below.
 
 . Packet switching under some circumstances. Packet 
 switches perform "the function of routing individual 
 data units based on address or other routing informa-
 tion contained in the units." 15 FCC Rcd at 3833, 
 p 302; 47 C.F.R. s 51.319(c)(4). The Commission for 
 the most part denied unbundling for packet switch-
 ing, requiring it only where the ILEC has used 
 digital loop carrier systems, placing a DSLAM at a 
 remote terminal and refusing to allow the competitor 
 to collocate its own DSLAM at that remote terminal. 
 15 FCC Rcd at 3838, p 313. That is, if the loop is 
 such that a remote DSLAM is necessary to provide 
 
 DSL service at all, and the ILEC has denied the 
 CLEC the right to collocate a DSLAM remotely, 
 then unbundling the packet switching (i.e., the 
 ILEC's own DSLAM) would be the only way to allow 
 the CLEC to provide DSL service.
 
 . Dedicated transport, defined as "facilities dedicated 
 to a particular customer or carrier that provide tele-
 communications between wire centers owned by in-
 cumbent LECs or requesting telecommunications 
 carriers, or between switches owned by incumbent 
 LECs or requesting telecommunications carriers." 
 Id. at 3842, p 322; 47 C.F.R. s 51.319(d)(1)(i). The 
 Commission expanded this traditional definition so as 
 to include all high-capacity transmission facilities of 
 specified types and "such higher capacities as evolve 
 over time," 15 FCC Rcd at 3843, p 323, as well as 
 dark fiber, id. at 3843-46, p p 325-30; 47 C.F.R. 
 s 51.319(d)(1)(ii).
 
 . Shared transport, defined as "transmission facilities 
 shared by more than one carrier, including the incum-
 bent LEC, between end office switches, between end 
 office switches and tandem switches, and between 
 tandem switches in the incumbent LEC's network." 
 15 FCC Rcd at 3862, p 370; 47 C.F.R. 
 s 51.319(d)(1)(iii).
 
 . Signaling networks and call-related databases. Sig-
 naling networks include signaling transfer points, to 
 which each local switch must be connected. 15 FCC 
 Rcd at 3868, p 384; 47 C.F.R. s 51.319(e). Call-
 related databases are "used in signaling networks for 
 billing and collection or the transmission, routing, or 
 other provision of telecommunications service." 15 
 FCC Rcd at 3875, p 403. The databases specifically 
 unbundled include the calling name database, the 911 
 database, the toll free calling database, and several 
 others. Id.
 
 . Operations support systems. These are the "func-
 tions supported by an incumbent LEC's databases 
 and information," including "pre-ordering, ordering, 
 
 provisioning, repair and maintenance, and billing." 
 15 FCC Rcd at 3884, p 425; 47 C.F.R. s 51.319(g).
 
 So far as we understand, this list is narrower than that 
which the Court reversed in Iowa Utilities Board only in its 
exclusion of some circuit switches, as well as of operator 
services and directory assistance. See 15 FCC Rcd at 3822-
31, p p 276-98, 3890-92, p p 438-42. In other areas, the Com-
mission's list has actually been expanded, now including high-
capacity loops, id. at 3777, p 176, 3780, p 184, dark fiber, id. at 
3785, p 196, 3843-46, p p 325-30, subloops, id. at 3788-89, 
p p 202-05, and packet switches in a few circumstances, id. at 
3832-35, p p 300-06.

 In what we call the "Line Sharing Order," In the Matters 
of Deployment of Wireline Services Offering Advanced Tele-
communications Capability and Implementation of the Local 
Competition Provisions of the Telecommunications Act of 
1996, Third Report and Order in CC Docket No. 98-147 and 
Fourth Report and Order in CC Docket No. 96-98, 14 FCC 
Rcd 20912 (1999), the Commission refined unbundling further. 
Copper loops have a range of spectrum in which the transmis-
sion of information is possible. Analog telephone service uses 
only the lower frequencies of that spectrum (typically 300 to 
3400 hz), leaving higher frequencies unused. Recent techno-
logical development allows the provision of DSL high-speed 
internet access over the high-frequency (i.e., 20,000+ hz) 
spectrum.1 By fitting the loop with splitters (which split 
apart voice and digital signals) and DSLAMs (Digital Sub-
scriber Line Access Multiplexers) (which send voice traffic to 
the circuit-switched telephone network and data traffic to the 
packet-switched data network), local carriers can provide both 

__________
 1 There are numerous types of DSL technology: ADSL (asym-
metric DSL, in which upstream transmissions are much slower than 
downstream), HDSL (high-speed DSL), UDSL (universal DSL), 
VDSL (very-high-speed DSL), and RADSL (rate-adaptive DSL). 
See Line Sharing Order, 14 FCC Rcd at 20915 n.5. The Commis-
sion here and elsewhere refers to these technologies collectively as 
"xDSL," the "x" serving as a generic identifier. In the interests of 
judicial economy, we shall simply use "DSL" as the generic term.

plain old telephone service and DSL internet access at the 
same time.

 In the "Line Sharing Order" the Commission decided that 
the high frequency portion of copper loop spectrum should be 
unbundled as to those loops on which ILECs are currently 
providing telephone service. The Commission defined the 
"high frequency" portion as simply any frequency "above the 
voiceband on a copper loop facility used to carry analog 
circuit-switched voiceband transmissions." Line Sharing Or-
der, 14 FCC Rcd at 20926, p 26; 47 C.F.R. s 51.319(h)(1).

 Such unbundling means, of course, that CLECs and ILECs 
would share the same copper loop to provide two different 
services at once. See, e.g., 14 FCC Rcd at 20923, p 17. The 
Commission clarified that the unbundling obligation extends 
to only one competitor per line. Id. at 20948, p 47.

 The Commission also required ILECs to condition loops, 
that is, to remove loading coils, bridge taps, and other voice-
band transmission enhancing equipment that tends to inter-
fere with DSL service. Id. at 20917; 20952-54, p p 81-87; 47 
C.F.R. s 51.319(h)(5). An ILEC can escape this obligation 
by demonstrating that conditioning would significantly de-
grade analog voice service. The Commission explicitly recog-
nized that such a showing would be practically impossible for 
loops under 18,000 feet. 14 FCC Rcd at 20954, p 86.

II. The Local Competition Order

 We note at the outset the extraordinary complexity of the 
Commission's task. Congress sought to foster competition in 
the telephone industry, and plainly believed that merely 
removing affirmative legal obstructions would not do the job. 
It thus charged the Commission with identifying those net-
work elements whose lack would "impair" would-be competi-
tors' ability to enter the market, yet gave no detail as to 
either the kind or degree of impairment that would qualify. 
We review the two orders with this in mind.

A. Unvarying Scope

 As to almost every element, the Commission chose to adopt 
a uniform national rule, mandating the element's unbundling 

in every geographic market and customer class, without 
regard to the state of competitive impairment in any particu-
lar market. As a result, UNEs will be available to CLECs in 
many markets where there is no reasonable basis for thinking 
that competition is suffering from any impairment of a sort 
that might have the object of Congress's concern.

 One reason for such market-specific variations in competi-
tive impairment is the cross-subsidization often ordered by 
state regulatory commissions, typically in the name of univer-
sal service. This usually brings about undercharges for some 
subscribers (usually rural and/or residential) and overcharges 
for the others (usually urban and/or business). Petitioners' 
opening brief in the Local Competition Order case cites 
testimony of a former FCC Chairman for the proposition that 
40% of telephone service is charged below cost, Petitioners' 
Br. at 35 & n.16, and the Commission and its supporting 
intervenors do not demur. See also, e.g., Robert W. Crandall 
& Thomas W. Hazlett, Telecommunications Policy Reform in 
the United States and Canada, at 18, Working Paper 00-9, 
AEI-Brookings Joint Center for Regulatory Studies (Dec. 
2000) (chart showing that in many American cities, businesses 
are charged substantially more than residences for single 
lines); see also generally Robert W. Crandall & Leonard 
Waverman, Who Pays for Universal Service? When Subsi-
dies Become Transparent (2000).

 Competitors will presumably not be drawn to markets 
where customers are already charged below cost, unless 
either (1) the availability of UNEs priced well below the 
ILECs' historic cost makes such a strategy promising, or (2) 
provision of service may, by virtue of economies of scale and 
scope, enable a CLEC to sell complementary services (such 
as long distance or enhanced services) at prices high enough 
to cover incomplete recovery of costs in basic service. The 
Commission never explicitly addresses by what criteria want 
of unbundling can be said to impair competition in such 
markets, where, given the ILECs' regulatory hobbling, any 
competition will be wholly artificial. And, although it offers 
an explanation as to why it is desirable as a general matter 
that CLECs should have "ubiquitous" unimpaired access to 

network elements, see Local Competition Order, 15 FCC Rcd 
at 3744, p p 97-98, it never explains why the record supports a 
finding of material impairment where the element in ques-
tion--though not literally ubiquitous--is significantly de-
ployed on a competitive basis in those markets where there is 
no reason to suppose that rates are artificially low, compare 
id. at 3847, p 335 (finding that 47 of the top 50 areas have 3 or 
more competitors providing interoffice transport), with id. at 
3849, p 340 (finding absence of requisite ubiquity for such 
transport).

 But it is in the other segments of the markets, where 
presumably ILECs must charge above cost (at least above 
average costs allocated in conventional regulatory fashion) in 
order to offset their losses in the subsidized markets, that the 
gap in the Commission's reasoning is greatest. In finding 
that the CLECs' lack of access to each of the many elements 
"materially diminish[ed]" their ability to provide service, the 
Commission nowhere appears to have considered the advan-
tage CLECs enjoy in being free of any duty to provide 
underpriced service to rural and/or residential customers and 
thus of any need to make up the difference elsewhere. As a 
matter of pure language, perhaps, one might regard as an 
"impairment" any cost disadvantage that the CLECs suffer in 
markets where ILECs are hampered by regulatory redistrib-
ution, even if the disadvantage is fully offset by the exigencies 
faced by ILECs. But the Commission has never explained 
why such a view makes sense. Indeed, pointing to evidence 
of considerable investment by CLECs in facilities for service 
in what are evidently the relatively overcharged markets, see, 
e.g., Petitioners' Br. at 16 (noting that as of 1999, CLECs had 
deployed transport facilities in all of the top 50 markets), the 
petitioners argue that there has been little or no real net 
impairment. The Commission responds with an expression of 
doubt whether these "data accurately reflects [sic] the extent 
to which alternatives are actually available to competitors." 
Local Competition Order, 15 FCC Rcd at 3849, p 341. But 
because the Commission has loftily abstracted away all specif-
ic markets, and because its concept of impairing cost-

differentials is so broad (an issue discussed below), we have 
no way of assessing the real meaning of that conclusion.

 We now turn to the reasons offered by the Commission for 
adopting an undifferentiated national rule for each element 
(with narrow exceptions). Having found legal authority to 
adopt such a rule, it said that it would help achieve the goals 
of the Act, to wit: (1) rapid introduction of competition, (2) 
promotion of facilities-based competition, investment and in-
novation, (3) certainty in the marketplace, (4) administrative 
practicality and (5) reduced regulation. See Local Competi-
tion Order, 15 FCC Rcd at 3754-62, p p 124-143; see also 47 
C.F.R. s 51.317(b)(3) (identifying same five factors as guiding 
Commission decision whether to unbundle a network ele-
ment).

 We first address the third and fourth justifications, both of 
which seemingly turn on how clear any non-universal rule can 
be. The Commission appears simply to assume that any such 
rule would be unpredictable and hard to apply. Yet the 
Commission itself, in regard to circuit switches, chose a 
partial rule, denying unbundling for local circuit switches 
serving customers with four or more lines in the highest-
density zone in any of the top 50 Metropolitan Statistical 
Areas ("MSAs"). See Local Competition Order, 15 FCC Rcd 
at 3823-31, p p 278-99. The Commission's order has no ex-
planation of why comparable differentiation was not available 
for other elements.

 As to reduced regulation, the Commission says that a 
national list "will result immediately in reduced regulation." 
Id. at 3762, p 143. It does not elaborate on this counterintui-
tive proposition. It goes on to say that a national list is 
consistent with "the deregulatory goals of the Act":

 Reduced regulation will occur as we remove elements 
 from the list as requesting carriers are no longer im-
 paired without access to those elements, and it otherwise 
 does not further the goals of the Act to continue requir-
 ing incumbent LECs to unbundle them.
 
Id. We understand that elimination of an entire universal 
mandate at one whack will achieve more deregulation than 
removal of a partial mandate. But imposition of a national 
mandate does not itself entail national elimination, and in any 
event we cannot see how imposition and then retraction of a 
national mandate is more deregulatory, overall, than imposi-
tion and retraction of a partial one.

 This leaves the more substantive justifications--the ideas 
that universal rules would promote the goals of the Act by 
leading to rapid introduction of competition, Local Competi-
tion Order, 15 FCC Rcd at 3754-57, p p 125-33, and to 
promotion of facilities-based competition, investment, and in-
novation, id. at 3757-60, p p 134-39. Using certain defini-
tions, the first point--more rapid introduction of competi-
tion--indeed follows automatically. If competition performed 
with ubiquitously provided ILEC facilities counts, the more 
unbundling there is, the more competition. The Commission, 
here in unison with the ILEC petitioners, evidently assumes 
that the Commission-imposed prices are highly attractive to 
CLECs; on that assumption, universal rules encompassing as 
many elements as possible would indeed generate a rapid 
spread of "competition."

 But the Commission never makes the argument in quite so 
stark a form, unwilling to embrace the idea that such com-
pletely synthetic competition would fulfill Congress's pur-
poses. Thus it turns to the argument that universal rules 
promote investment and facilities-based competition.

 The Commission says that "adoption of a national list" will 
"facilitate the deployment" of competitive facilities. Id. at 
3757, p 134. There are plainly two sides to the effects on 
investment of ubiquitously available UNEs at Commission-
mandated prices. On one side, the more widespread the 
availability of elements that can be more efficiently provided 
by the incumbent (presumably because of economies of scale 
and scope--an issue to which we'll return), the quicker com-
petitors will set about providing the other elements and 
offering of complete competitive service, including long dis-
tance service. Compare Iowa Utilities Board, 525 U.S. at 

416-17 (Breyer, J., concurring in part and dissenting in part), 
cited at Respondent's Br. 32-33. Further, access to UNEs 
may enable a CLEC to enter the market gradually, building a 
customer base up to the level where its own investment would 
be profitable.

 On the other side, the petitioners argued before the Com-
mission that mandatory unbundling at Commission-mandated 
prices reduces the incentives for innovation and investment in 
facilities. Their reasoning, of course, is that a regulated price 
below true cost will reduce or eliminate the incentive for an 
ILEC to invest in innovation (because it will have to share the 
rewards with CLECs), and also for a CLEC to innovate 
(because it can get the element cheaper as a UNE). Indeed, 
many prices that seem to equate to cost have this effect. 
Some innovations pan out, others do not. If parties who have 
not shared the risks are able to come in as equal partners on 
the successes, and avoid payment for the losers, the incentive 
to invest plainly declines.2 See Iowa Utilities Board, 525 

__________
 2 The Commission's standard for deciding that a network ele-
ment should be unbundled--whether lack of access to it "materially 
diminishes" the requesting carrier's "ability" to provide the ser-
vices in question--implicitly builds in a relation to the prices at 
which CLECs get access to UNEs. (The Commission is rarely 
clear on precisely what costs are being compared, but in saying that 
lack of access to unbundled elements would cause a material 
increase in cost it often uses terms implying that the comparison is 
to the Commission-mandated price of unbundled elements, i.e., at 
present TELRIC. See, e.g., 15 FCC Rcd at 3815, p 263; id. at 
3864, p 375.) Lack of access would not diminish the requester's 
ability at all if it could secure the function more cheaply on its own. 
Thus, the closer the Commission's pricing principle is to the low end 
of what it may lawfully set, the greater the probability that lack of 
access would cause "material diminution." As a result low UNE 
prices would not only have the direct effect mentioned in the text, 
but would inherently tend to expand the sphere of these effects. As 
the "price squeeze" jurisprudence shows, even prices that are set 
within the band of what is lawfully permissible may have perverse 
effects, and the Commission may be obligated to consider them. 
Cf. FPC v. Conway Corp., 426 U.S. 271, 278-79 (1976); Sprint 

U.S. at 428-29 (Breyer, J., concurring in part and dissenting 
in part); cf. FPC v. Hope Natural Gas Co., 320 U.S. 591, 647-
53 (1944) (Jackson, J., dissenting) (discussing supply implica-
tions of cost-based regulation of natural gas production). In 
any event, the Commission's own assumption that universal 
access to virtually all network elements would prove attrac-
tive (leading to rapid introduction of "competition") suggests 
that such a disincentive effect cannot be discounted a priori.

 The Commission's only response is to point to evidence that 
both CLECs and ILECs have built facilities since passage of 
the 1996 Act (the same evidence invoked by the ILECs to 
show the existence of many markets where unbundling is 
unneeded), despite the Act's obviously having created a pros-
pect of unbundling. Local Competition Order, 15 FCC Rcd 
at 3758-59, p p 135-38. But the existence of investment of a 
specified level tells us little or nothing about incentive effects. 
The question is how such investment compares with what 
would have occurred in the absence of the prospect of unbun-
dling, compare Sugar Cane Growers Cooperative of Florida v. 
Veneman, No. 01-5335, 2002 Westlaw ----, slip op. at 7 (D.C. 
Cir. May 10, 2002); Competitive Enterprise Institute v. 
NHTSA, 956 F.2d 321, 325 (D.C. Cir. 1992), an issue on which 
the record appears silent. Although we can't expect the 
Commission to offer a precise assessment of disincentive 
effects (a lack of multiple regression analyses is not ipso facto 
arbitrary and capricious), we can expect at least some con-
frontation of the issue and some effort to make reasonable 
trade-offs.

 In the end, then, the entire argument about expanding 
competition and investment boils down to the Commission's 
expression of its belief that in this area more unbundling is 
better. But Congress did not authorize so open-ended a 
judgment. It made "impairment" the touchstone. The Com-
mission argues that s 251(d)(2), directing it to consider neces-
sity and impairment "at a minimum," clearly allows it to 
consider other elements. We assume in favor of the Commis-
sion that that is so. But to the extent that the Commission 
orders access to UNEs in circumstances where there is little 
or no reason to think that its absence will genuinely impair 
__________

Communications Co. L.P. v. FCC, 274 F.3d 549, 555 (D.C. Cir. 
2001).

competition that might otherwise occur, we believe it must 
point to something a bit more concrete than its belief in the 
beneficence of the widest unbundling possible.

 Besides the analysis described above, the Commission ad-
dressed the question whether Iowa Utilities Board precluded 
its adoption of universal rules for each network element. It 
concluded that nothing in that opinion would require it "to 
determine, on a localized state-by-state or market-by-market 
basis which unbundled elements are to be made available." 
Local Competition Order, 15 FCC Rcd at 3753, p 122. We 
certainly agree that the Court's brief passage reversing the 
Commission on the impairment issue contained little detail as 
to the "right" way for the Commission to go about its work. 
But the Court's point that if "Congress had wanted to give 
blanket access to incumbents' networks," it "would simply 
have said (as the Commission in effect has) that whatever 
requested element can be provided must be provided," Iowa 
Utilities Board, 525 U.S. at 390, suggests that the Court read 
the statute as requiring a more nuanced concept of impair-
ment than is reflected in findings such as the Commission's--
detached from any specific markets or market categories.

B. Kinds of Cost Disparities

 Petitioners complain that the Commission myopically fo-
cused on "cost differences," thereby skewing its inquiry to 
produce the maximum unbundling.

 Of course any cognizable competitive "impairment" would 
necessarily be traceable to some kind of disparity in cost. 
Indeed, the ILECs argued before the Commission and the 
Supreme Court that Congress intended that the impairment 
standard embody the criteria of the "essential facilities" 
doctrine, see Iowa Utilities Board, 525 U.S. at 388, which 
itself turns on concepts of cost. The doctrine's basic idea is 
that where one firm controls some facility (such as a bridge) 
that is essential for competition in a broader market, and it 
would make no economic sense for competitors to duplicate 
the facility, and certain other criteria are satisfied, see gener-
ally Phillip E. Areeda & Herbert Hovenkamp, 3A Antitrust 
Law p p 771-73 (1996), the owner may be compelled to share 
the facility with its competitors. The classic case where 
competitor duplication would make no economic sense is 

where average costs are declining throughout the range of 
the relevant market. See Areeda & Hovenkamp, supra, at 
p 771c; see also 2 Alfred E. Kahn, The Economics of Regula-
tion: Principles and Institutions 119 (1989). In such a case, 
duplication, even by the most efficient competitors imagin-
able, would only lead to higher unit costs for all firms, and 
thus for customers. See Areeda & Hovenkamp, supra, at 
p 771c; 2 Kahn, supra, at 122; see also generally Iowa 
Utilities Board, 525 U.S. at 416-17, 427-31 (Breyer, J., 
concurring in part and dissenting in part).3 Thus the Su-
preme Court in Verizon observed that "entrants may need to 
share some facilities that are very expensive to duplicate (say, 
loop elements) in order to be able to compete in other, more 
sensibly duplicable elements (say, digital switches or signal-
multiplexing technology)." Verizon, slip op. at 38 n.27 (em-
phasis added). See also id. at 39 n.27 (characterizing the 
elements with respect to which new entrants and incumbents 
are not required to compete (i.e., the elements to be unbun-
dled) as those " 'the duplication of [which] would prove unnec-
essarily expensive' ") (quoting Justice Breyer, post, at 8, 
dissenting). 

 Petitioners' position here is fundamentally that the Com-
mission relied on cost disparities that, far from being any 
indication that competitive supply would be wasteful, are 
simply disparities faced by virtually any new entrant in any 
sector of the economy, no matter how competitive the sector. 
See Petitioners' Br. at 28. Indeed, the Commission's order 
does reflect an open-ended notion of what kinds of cost 
disparity are relevant.

 For example, in the discussion of local switching, the 
Commission notes that there are economies of scale in 
switches, Local Competition Order, 15 FCC Rcd at 3812-13, 
p 259, and that it is cheaper to buy a 20,000-line switch than 
four increments of 5000 lines each, id. at 3813, p 260. The 
Commission refers explicitly to a CLEC's probable inability 
to enjoy scale economies comparable to ILECs' "particularly 
in the early stages of entry." Id. at 3814, p 261 (emphasis 
__________
 3 Compare William J. Baumol, On the Proper Cost Tests for 
Natural Monopoly in a Multiproduct Industry, 67 Amer. Econ. 
Rev. 809 (1977) (proposing concept of "subadditivity" for ascertain-
ment of natural monopoly), and William W. Sharkey, The Theory 
of Natural Monopoly (1982) (further development of subadditivity).

added). But average unit costs are necessarily higher at the 
outset for any new entrant into virtually any business. The 
Commission has in no way focused on the presence of econo-
mies of scale "over the entire extent of the market." 2 Kahn, 
supra, at 119 (emphasis added). Without a link to this sort of 
cost disparity, there is no particular reason to think that the 
element is one for which multiple, competitive supply is 
unsuitable. See generally id. at 119-26.

 The Commission of course has recognized that marketplace 
changes and increases in competition may justify later reduc-
tions in unbundling mandates. See, e.g., Local Competition 
Order, 15 FCC Rcd at 3704, p 15. But this acknowledgement 
doesn't respond to the analytical problem. To rely on cost 
disparities that are universal as between new entrants and 
incumbents in any industry is to invoke a concept too broad, 
even in support of an initial mandate, to be reasonably linked 
to the purpose of the Act's unbundling provisions.

 Each unbundling of an element imposes costs of its own, 
spreading the disincentive to invest in innovation and creating 
complex issues of managing shared facilities. See Iowa Utili-
ties Board, 525 U.S. at 428-29 (Breyer, J., concurring in part 
and dissenting in part). At the same time--the plus that the 
Commission focuses on single-mindedly--a broad mandate 
can facilitate competition by eliminating the need for separate 
construction of facilities where such construction would be 
wasteful. Id. at 416-17. Justice Breyer concluded that 
fulfillment of the Act's purposes therefore called for "balance" 
between these competing concerns. Id. at 429-30. A cost 
disparity approach that links "impairment" to universal char-
acteristics, rather than ones linked (in some degree) to natu-
ral monopoly, can hardly be said to strike such a balance. 
The Local Competition Order reflects little Commission effort 
to pin "impairment" to cost differentials based on characteris-
tics that would make genuinely competitive provision of an 
element's function wasteful.

 Petitioners here do not explicitly attack the Commission for 
its refusal to incorporate the essential facilities doctrine, and 
we do not intend to suggest that the Act requires use of that 
doctrine's criteria.4 But what we do say is that cost compari-
__________
 4 We note that scholars have raised very serious questions 
about the wisdom of the essential facilities doctrine as a justification 

sons of the sort made by the Commission, largely devoid of 
any interest in whether the cost characteristics of an "ele-
ment" render it at all unsuitable for competitive supply, seem 
unlikely either to achieve the balance called for explicitly by 
Justice Breyer or implicitly by the Court as a whole in its 
disparagement of the Commission's readiness to find "any" 
cost disparity reason enough to order unbundling. The Com-
mission's addition of a materiality notion, see Local Competi-
tion Order, 15 FCC Rcd at 3725, p 51 (finding impairment in 
any case where lack of access to an element "materially" 
diminishes ability to provide services), submits to the Court's 
ruling in a nominally quantitative sense (though the reality of 
such acquiescence cannot be measured and may be belied by 
the virtual identity of the old and new orders). More impor-
tant, adding the adjective "material" contributes nothing of 
any analytical or qualitative character that would fulfill the 
Court's demand for a standard "rationally related to the goals 
of the Act." Iowa Utilities Board, 525 U.S. at 388.

 Because the Commission's concept of "impairing" cost dis-
parities is so broad and unrooted in any analysis of the 
competing values at stake in implementation of the Act, we 
cannot uphold even the two non-universal mandates adopted 
by the Commission (for circuit switches and packet switches).

 Petitioners also attack the rules on specific elements. 
Some of these attacks parallel the universality and cost-
disparity issues already discussed. Petitioners' critique as to 
advanced services equipment coalesces with the issues they 
raise about the Line Sharing Order (see below). This leaves 
two issues, neither of which we need address here. First, 
petitioners attack the Commission's requirements of certain 
information disclosure and "loop conditioning." After re-
mand, these issues may well be moot, and if they recur will do 

__________
for judicial mandates of competitor access, and accompanying judi-
cial price setting. See, e.g., Areeda & Hovenkamp, supra, at 
p 771c. But a doctrine that is inadequate for that purpose may 
nonetheless offer useful concepts for agency guidance when Con-
gress has directed an agency to provide competitor access in a 
specific industry.

so in a different context. Second, petitioners argue that the 
"enhanced extended link" condition to the exception to the 
switch unbundling mandate is in reality a mandate to combine 
otherwise uncombined network elements, and is therefore 
invalid. The Supreme Court appears to have definitely re-
moved the basis of this claim, holding that the Commission 
has authority to require such combinations, affirmatively--
that is, not merely as a condition to an unbundling exception. 
See Verizon, slip op. at 58-68. If any comparable claim 
somehow survives, it too can be raised in the remand pro-
ceedings. 

III. The Line Sharing Order

 Petitioners primarily attack the Line Sharing Order on the 
ground that the Commission, in ordering unbundling of the 
high frequency spectrum of copper loop so as to enable 
CLECs to provide DSL services, completely failed to consider 
the relevance of competition in broadband services coming 
from cable (and to a lesser extent satellite). We agree.

 The Commission's own findings (in a series of reports 
under s 706 of the 1996 Act) repeatedly confirm both the 
robust competition, and the dominance of cable, in the broad-
band market. The first s 706 report found that "[n]umerous 
companies in virtually all segments of the communications 
industry are starting to deploy, or plan to deploy in the near 
future, broadband to the consumer market," including "cable 
television companies, incumbent LECs, some utilities, and 
'wireless cable' companies." In the Matter of Inquiry Con-
cerning the Deployment of Advanced Telecommunications 
Capability to All Americans in a Reasonable and Timely 
Fashion, and Possible Steps to Accelerate Such Deployment 
Pursuant to Section 706 of the Telecommunications Act of 
1996, 14 FCC Rcd 2398, 2404 p 12 (1999). The Commission 
also noted that the "most popular offering of broadband to 
residential consumers is via 'cable modems'...." id. at 2426, 
p 54, that "no competitor has a large embedded base of 
paying residential consumers," id. at 2423, p 48, and that the 
"record does not indicate that the consumer market is inher-
ently a natural monopoly," id. The most recent s 706 Report 

(not in the record of this case) is consistent: As of the end of 
June 2001, cable companies had 54% of extant high-speed 
lines, almost double the 28% share of asymmetric DSL. 
Third Report Pursuant to s 706, 2002 FCC LEXIS 655, at 
p p 44, 48 (Feb. 6, 2002). Even in the Local Competition 
Order on review in this case, the Commission said, "Competi-
tive LECs and cable companies appear to be leading the 
incumbent LECs in their deployment of advanced services." 
15 FCC Rcd at 3835, p 307.

 Relying on the Commission's repeated findings, petitioners 
argue that it is "antithetical to the 1996 Act's language and 
deregulatory objectives" to mandate unbundling in a market 
that "already has intense facilities-based competition." DSL 
Petitioners' Br. at 3. They note the Supreme Court's obser-
vation that a proper "impairment" standard should be limited 
by the "goals of the Act." Id. at 23 (quoting Iowa Utilities 
Board, 525 U.S. at 388).

 The Commission's response to this argument is to say that 
it was "merely adhering" to the letter of the statute: Thus it 
quotes the instruction of s 251(d)(2)(B) that it consider 
whether "failure to provide access to such network elements 
would impair the ability of the telecommunications carrier 
seeking access to provide the services that it seeks to offer." 
DSL Respondent's Br. at 20, quoting 47 U.S.C. s 251(d)(2)(B) 
(emphasis added by Respondent). On this theory the Com-
mission believes it was justified in focusing solely on DSL 
because that is what "CLECs seek to offer when they request 
line sharing." Id. at 21. The Commission thus appears to 
acknowledge that it adopted the Line Sharing Order with 
indifference to petitioners' contentions about the state of 
competition in the market.

 The Commission's inference from s 251(d)(2)(B)'s allusion 
to the services the requester "seeks to offer" strikes us as 
quite unreasonable. See Chevron U.S.A. Inc. v. Natural 
Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). 
As Justice Breyer's separate opinion carefully explained, 
mandatory unbundling comes at a cost, including disincen-
tives to research and development by both ILECs and 

CLECs and the tangled management inherent in shared use 
of a common resource. Iowa Utilities Board, 525 U.S. at 
428-29. And, as we said before, the Court's opinion in Iowa 
Utilities Board, though less explicit than Justice Breyer on 
the need for balance, plainly recognized that unbundling is 
not an unqualified good--thus its observation that the Com-
mission must "apply some limiting standard, rationally relat-
ed to the goals of the Act," id. at 388, and its point that the 
Commission "cannot, consistent with the statute, blind itself 
to the availability of elements outside the incumbent's net-
work," id. at 389. In sum, nothing in the Act appears a 
license to the Commission to inflict on the economy the sort 
of costs noted by Justice Breyer under conditions where it 
had no reason to think doing so would bring on a significant 
enhancement of competition. The Commission's naked disre-
gard of the competitive context risks exactly that result.

 Accordingly, the Line Sharing Order must be vacated and 
remanded. Obviously any order unbundling the high fre-
quency portion of the loop should also not be tainted by the 
sort of error identified in our discussion of the Local Compe-
tition Order and identified by petitioners here as well.

 Petitioners also claim that the Commission without expla-
nation reversed a prior decision that a portion of the spec-
trum of a loop cannot qualify as a "network element." The 
Commission urges that any language suggesting such a view 
is explicable as simply reflecting a judgment on technical 
feasibility, which it here reversed on the basis of a reexamina-
tion of the facts. Line Sharing Order, 14 FCC Rcd at 20942-
43, p 63. We think the Commission's view is convincing.

 Finally, petitioners attack the Commission's pricing rule, 
which limited an ILEC's charges for access to the high 
frequency portion of the loop to the value the ILEC "allocat-
ed to [asymmetric] DSL services when it established its 
interstate retail rates for those services," even where this rule 
would reduce the charges below the level derived from the 
Commission's general UNE pricing principles. Line Sharing 
Order, 14 FCC Rcd at 20975-76, p 139. As in the case of the 
element-specific claims raised in the Local Competition Order 

case, we think the possible mootness, and certainty that any 
recurrence will be in a different context, warrant deferring 
the issue to another day.

 * * *

 We grant the petitions for review, and remand both the 
Line Sharing Order and the Local Competition Order to the 
Commission for further consideration in accordance with the 
principles outlined above.

 So ordered.